# Supreme Court of Texas

No. 20-0999

Texas Health and Human Services Commission,

*Petitioner*,

v.

Dimitria Pope and Shannon Pickett,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued November 29, 2022**

JUSTICE BUSBY delivered the opinion of the Court.

This case concerns when a public employee "reports a violation of law by the employing governmental entity or another public employee" under the Texas Whistleblower Act. Because the plaintiff employees did not expressly report any legal violations by the Health and Human Services Commission (HHSC) that could have led to their terminations, and at most voiced disagreement regarding enforcement policies that were within the discretion of HHSC management, their conduct was not

protected by the Whistleblower Act. Accordingly, we reverse the court of appeals' judgment and render judgment dismissing the suit.

## BACKGROUND

Respondents Dimitria Pope and Shannon Pickett served as Director and Associate Director of HHSC's Medical Transportation Program (MTP) from 2012 and 2013, respectively. The MTP works to provide Medicaid beneficiaries with nonemergency transportation to and from medical providers, as required by federal law. Specifically, the MTP pays private contractors to provide the transportation and seeks partial reimbursement from the federal government under the Medicaid program. Federal and state Medicaid statutes and rules require that children who are Medicaid beneficiaries be accompanied to be eligible to receive transportation services and for the claim to be eligible for federal Medicaid reimbursement. *See* 42 C.F.R. §§ 431.53, 440.170; TEX. HUM. RES. CODE § 32.024(a); 1 TEX. ADMIN. CODE §§ 380.201, .207(4), .209.

Between 2012 and 2017, Pope and Pickett raised concerns that LeFleur Transportation, a private nonemergency medical transportation provider in South Texas, was transporting children under 15 to medical appointments without an accompanying parent, guardian, or adult authorized by a parent or guardian. In emails, phone calls, and face-to-face meetings with HHSC's Office of the Inspector General (OIG), HHSC executives, the FBI, and the Texas Attorney General's Office (OAG), Pope and Pickett repeatedly discussed their beliefs that LeFleur, its subcontractors, competitors, medical providers, parents, and other individuals were violating the accompaniment requirements. The alleged violations included: a single adult attending

2

to multiple, unrelated children; drivers serving as accompanying adults; employees of medical providers serving as accompanying adults; and transportation of minors in vehicles owned or operated by the medical providers. The correspondence included a February 2014 email from Pope to OIG, which reported that some HHSC call center employees were "allowing" unauthorized adults to accompany minors and that some providers were encouraging parents to call the center repeatedly until they received approval.

Before 2014, HHSC used a "fee-for-service" model to pay contractors for each documented, eligible ride. HHSC then transitioned to a "managed care" model, under which contractors are paid based on the number of people served each month regardless of the actual number of rides provided. Under the managed care model, providers are subject to a profit cap and obligated to make "experience rebate" payments for any profits above the cap, which OIG is charged with collecting on HHSC's behalf. *See* TEX. GOV'T CODE §§ 531.102, 533.014(a); 1 TEX. ADMIN. CODE §§ 353.3, 371.11(a).

In October 2014, a federal audit by the United States Department of Health and Human Services concluded that HHSC did not always comply with federal and state requirements for reimbursement of nonemergency medical transportation claims it had submitted in 2011. The audit recommended that HHSC repay over $30 million in reimbursements Texas had received from the federal government. According to Pope, over $12 million of this amount was due to noncompliance with the accompaniment requirement.

3

In 2017, Pope and Pickett were helping OIG's audit resolution team respond to the federal audit. Given the lack of contemporaneous documents showing compliance with requirements relating to the transportation of minors, federal officials requested a letter from State Medicaid Director Jami Snyder addressing compliance. Pope and Pickett were part of the team helping to draft Snyder's letter, which asked that the claims at issue be considered allowable, thus removing HHSC's financial liability for repayment. Pickett sent her edits to the draft letter by email to OIG's Federal Audit Coordination Manager. Pickett pointed out in her email that some statements in the draft letter were not accurate, were not reported to federal officials by the program, and could not be supported by documents in the MTP's possession. The federal audit manager later stated in a declaration that he believed Pickett's points to be "customary, appropriate responses from MTP management to ensure the letter was correct," and that he was "not aware of Ms. Pickett reporting any violations of law by any party."

Around the same time, OIG began investigating whether Pope and Pickett had engaged in "official oppression" of LeFleur, and HHSC managers became concerned about litigation risks if Pope and Pickett continued to interact with LeFleur. Pope and Pickett were told to "stand down" on their attempts to collect $5.6 million in experience rebate payments that LeFleur had not timely paid HHSC. Meanwhile, HHSC senior managers were negotiating directly with LeFleur to discuss payment options that would allow LeFleur to stay in business while making payments, cutting Pope and Pickett out of those discussions.

4

Two days after Pickett's last email exchange with the federal audit manager about Snyder's letter, HHSC fired Pope and Pickett.

Pope and Pickett sued HHSC under the Texas Whistleblower Act, alleging they were terminated in retaliation for their "good faith reports" about "violations of law" by HHSC to various law enforcement agencies. *See* TEX. GOV'T CODE § 554.002. According to Pope and Pickett, their reports to OIG, OAG, and the FBI about LeFleur's violations of the accompaniment requirements also impliedly reported misconduct by HHSC, which would have been receiving federal reimbursement for ineligible claims. In a later filing, Pope and Pickett contended that they reported further violations when they informed OIG about HHSC's failure to enforce the experience rebate requirements against LeFleur.

HHSC responded by filing a combined plea to the jurisdiction and motion for summary judgment, arguing that Pope and Pickett failed to demonstrate that they made "good faith reports" about an actual "violation of law" by HHSC.[1] The trial court denied the plea and motion, and the court of appeals affirmed, holding that Pope and Pickett "carried their burden to establish a genuine issue of material fact on each of the elements of their Whistleblower claim." 646 S.W.3d 562, 577 (Tex. App.—Austin 2020). The court of appeals reasoned that under the federal Medicaid reimbursement scheme, the reports Pope and Pickett made about LeFleur's violations of law were "necessarily" reports of violations by HHSC as well. *Id.* at 573. The court also agreed with Pope

---

[1] HHSC also argued in the trial court and court of appeals that Pope and Pickett failed to show that their alleged reports were a but-for cause of their terminations. HHSC has not pressed that issue in this Court.

5

and Pickett that they "could have reasonably believed in good faith that HHSC was violating the law by allowing LeFleur to avoid pay[ing]" the experience rebates. *Id.* at 574. We granted HHSC's petition for review.

## ANALYSIS

The Whistleblower Act provides that "[a] state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE § 554.002(a). The Act defines "law" as a "state or federal statute; an ordinance of a local governmental entity; or a rule adopted under a statute or ordinance." *Id.* § 554.001. It also defines "public employee" as "an employee or appointed officer *other than an independent contractor* who is paid to perform services for a state or local governmental entity" and provides definitions for "state governmental entity" and "local governmental entity." *Id.* (emphasis added).

Pope and Pickett contend that they were terminated for reporting two types of violations of law: (1) violations of the accompaniment requirement for nonemergency medical transportation that LeFleur provided to minors, and (2) HHSC's failure to collect experience rebate payments owed by LeFleur. We address each theory in turn. Taking the entire record into account, we conclude for the reasons below that Pope and Pickett have not provided evidence to support a finding that they made "good faith reports [of] a violation of law by the employing

6

governmental entity or another public employee." *Id.* § 554.002(a). The trial court therefore erred in denying HHSC's plea to the jurisdiction.

## I. Standard of review

The State and its agencies, including HHSC, "are immune from suit and liability in Texas unless the Legislature expressly waives sovereign immunity." *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009). An agency may assert its immunity in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004); *see also Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). Although immunity from suit is a jurisdictional question generally distinct from immunity from liability, we have held the two are interwoven in the context of the Whistleblower Act, which requires plaintiffs to allege jurisdictional facts giving rise to an actual violation of the Act to qualify for the statutory waiver of immunity. *Lueck*, 290 S.W.3d at 881; *see* TEX. GOV'T CODE §§ 554.003(a) (authorizing suit by public employee terminated in violation of Act), .0035 (waiving immunity "to the extent of liability for the relief allowed under this chapter for a violation of this chapter").

A plea to the jurisdiction presents a question of law that is reviewed de novo on appeal, *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007), mirroring the standard applied to a traditional motion for summary judgment, *City of San Antonio v. Maspero,* 640 S.W.3d 523, 528 (Tex. 2022). When a plea to the jurisdiction challenges the existence of alleged jurisdictional facts, such as those necessary to establish a claim under the Whistleblower Act, "we must move beyond the pleadings and consider evidence when necessary to resolve the

7

jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770-71 (Tex. 2018).

A defendant that files a plea to the jurisdiction has the initial burden of meeting the summary judgment standard of proof for its assertion that the courts lack jurisdiction; if it does so, the plaintiff must then "show that a disputed material fact exists regarding the jurisdictional issue." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). When a fact issue exists, the plea to the jurisdiction should be denied. *Id.* If the plaintiff fails to raise a fact question on the jurisdictional issue or the relevant evidence supporting the defendant's assertion is undisputed, the plea to the jurisdiction must be granted as a matter of law. *Id.* "[I]n determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Alamo Heights*, 544 S.W.3d at 771. In doing so, "we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Id.*

## II.    Accompaniment requirement

### A.    Implied reports are not "reports [of] a violation of law by the employing governmental entity" under the Act.

Pope and Pickett's primary position is that they reported "violations of law by the employing governmental entity" when they made extensive and well-documented reports to various law

8

enforcement authorities of violations by LeFleur, its subcontractors, competitors, and various medical providers in South Texas relating to the transportation of minors without accompanying parents, guardians, or other authorized adults. As discussed above, they made these reports to HHSC leadership, OIG, OAG, and the FBI.

HHSC does not contest in this Court that these recipients included "appropriate law enforcement authorit[ies]" under the Whistleblower Act, and it mostly does not challenge at this stage (with one exception we discuss below) whether the reports were a cause of Pope's and Pickett's terminations. Rather, the parties disagree about whether these reports satisfied the Whistleblower Act's requirement that they reported a "violation of law" by HHSC, the "employing governmental entity." TEX. GOV'T CODE § 554.002(a).

The court of appeals agreed with Pope and Pickett's arguments that these reports against LeFleur were also "impliedly" made against HHSC because of the structure of Medicaid's federal reimbursement scheme. 646 S.W.3d at 572-73. We disagree and hold that the Whistleblower Act protects only express reports to an appropriate law enforcement authority that unambiguously identify the employing governmental entity or another public employee as the violator.

Viewing the record in the light most favorable to Pope and Pickett, we assume that their complaints stemmed from a commendable desire to keep the program in compliance with federal and state law so that HHSC would not have to repay millions of dollars in federal reimbursements. Indeed, the federal audit report shows that their concerns were well founded.

9

But the Whistleblower Act excludes from its scope violations of law by independent contractors such as LeFleur, protecting only reports of violations by the "employing governmental entity" or other "public employee[s]." TEX. GOV'T CODE § 554.002(a). Neither description applies to Pope's and Pickett's reports about misconduct by LeFleur. Pope and Pickett were employed by HHSC (not LeFleur), and the statute carves out independent contractors from the definition of "public employee." *Id.* § 554.001(4) (defining "public employee" as a paid "employee or appointed officer other than an independent contractor" who performs services for a governmental entity).[2]

Nor can Pope's and Pickett's reports of violations by LeFleur be treated as reports of violations by their employer HHSC under the statutory text and this Court's precedents. Although the court of appeals reasoned that Pope and Pickett had also reported a violation of law by HHSC because they "would be aware that by reporting LeFleur's violation of law, they would necessarily be reporting HHSC's violation of law," 646 S.W.3d at 573, this "implied report" theory cannot be squared with the text of the Act.

Rather, the Act requires the reporting employee to make an actual, express statement of acts or omissions "*by*" the entity or other public employee. TEX. GOV'T CODE § 554.002(a) (emphasis added). A

---

[2] Other federal and state courts have likewise held that the Act does not protect reports of misconduct by independent contractors or outside vendors because they are not employing governmental entities or public employees. *See Denton v. Morgan*, 136 F.3d 1038, 1045-46 (5th Cir. 1998); *City of Houston v. Smith*, No. 01-14-00789-CV, 2015 WL 4967020, at *5-8 (Tex. App.—Houston [1st Dist.] Aug. 20, 2015, no pet.); *Saldivar v. Tex. Dep't of Assistive & Rehab. Servs.*, No. H-08-1820, 2009 WL 3386889, at *13 (S.D. Tex. Oct. 13, 2009).

10

reporting employee's unspoken belief that her statements about conduct by a third party will necessarily be understood by the receiving law enforcement authority as a report of conduct by the employing entity or another employee as well is not sufficient.

As we recently held in *City of Fort Worth v. Pridgen*, a report must "convey information that exposes or corroborates a violation of law or otherwise provide relevant, additional information that will help identify or investigate illegal conduct." 653 S.W.3d 176, 184 (Tex. 2022). To serve these functions, the report must specify whose conduct is violating the law. We have also held that the "report must be direct" in the sense that it must be made "directly" to an "appropriate law enforcement authority." *Tex. Comm'n on Env't Quality v. Resendez*, 450 S.W.3d 520, 521, 523 (Tex. 2014). The same reasoning applies with equal force to the report being "directly" about the misconduct of "the employing governmental entity or another public employee." *Id.* at 521; TEX. GOV'T CODE § 554.002(a).

Similarly, when the Act was passed, Black's Law Dictionary defined "report" as "[a]n official or formal statement of facts or proceedings. To give an account of, to relate, to tell, to convey or disseminate information."[3] Official or formal statements of facts and proceedings are not presented by implication or with the expectation that the recipient will "read between the lines."

The "good faith" element of the Whistleblower Act does not steer Pope and Pickett's claims toward a safer harbor. Although our

---

[3] *Report,* Black's Law Dictionary (6th ed. 1990).

11

precedents explain that the Act protects employees who honestly and reasonably believe they are reporting an "*actual* violation of law," even where what is reported does not actually amount to a violation, these precedents all recognize that an *actual report* has to be made. *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 627 n.3 (Tex. 2010); *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 320 (Tex. 2002) (emphasis added). The conduct must be "reported," not implied or insinuated.

Put another way, employees can be protected by the Whistleblower Act for reporting only perceived—rather than actual—violations of the law, *City of Elsa*, 325 S.W.3d at 627 n.3, when their report is consistent with the subjective and objective prongs of the good faith standard, *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex. 1996). But employees cannot earn the Act's protection if they only *perceive* that they reported misconduct by the "employing governmental entity or another public employee." TEX. GOV'T CODE § 554.002(a). They must actually make an express report.

Indeed, the Act's structure relies on the report being made to an "appropriate law enforcement authority" with the power to enforce the law alleged to be violated or to investigate or prosecute criminal violations. TEX. GOV'T CODE § 554.002(b); *see, e.g.*, *Resendez*, 450 S.W.3d at 523; *Tex. Dep't of Hum. Servs. v. Okoli*, 440 S.W.3d 611, 616-17 (Tex. 2014); *Univ. of Hous. v. Barth*, 403 S.W.3d 851, 857 (Tex. 2013). It is hard to understand how a report could be implied "to" such an authority. For these bodies to conduct their investigations properly, they must have access to reports that concretely identify the alleged misconduct and the responsible party, rather than being left to rely on guesswork,

12

innuendo, and "reading between the lines" as they try to figure out what exactly they are being asked to investigate.

Our cases emphasize that the Texas Whistleblower Act does not protect purely internal reports because, unlike federal and other state whistleblower statutes, the Act only "protects those who report to authorities that issue legal directives, not authorities that follow them." *Univ. of Tex. Sw. Med. Ctr. v. Gentilello*, 398 S.W.3d 680, 686-87 (Tex. 2013); *cf.* 5 U.S.C. § 2302(f)(1); N.Y. LAB. LAW § 740(2) (McKinney 2022). Just as internal reports to supervisors fail to provide "authorities that issue legal directives" with the information needed for them to carry out their investigative and enforcement functions, reports that rely on innuendo and implication also fail to provide such authorities with the information necessary to act on reports of alleged misconduct. *Gentilello*, 398 S.W.3d at 686. Thus, for the same reason that the Whistleblower Act protects only direct reports of a violation of law, it also protects only express reports of a violation of law. *See Resendez*, 450 S.W.3d at 523.

Pope's and Pickett's reports of accompaniment violations do not meet these standards, as the conduct reported was LeFleur's—not HHSC's. In addition, as we explain below, none of these reports identified an act or omission by HHSC that gave rise to a "violation of law."

## B.    Pope's February 2014 email reporting conduct by other HHSC employees is too remote to support causation.

The closest Pope and Pickett came to expressly reporting violations of law by HHSC or other public employees is a February 2014

13

email from Pope to the OIG Inspector General, which included a report that some HHSC call center employees were "allowing" unauthorized adults to accompany minors and that some providers were encouraging parents to call the center repeatedly until they received approval. The email does not mention LeFleur by name, even though it does name several other medical providers in South Texas.

HHSC argues that rather than providing evidence of HHSC employee misconduct, the email shows HHSC's victimization at the hands of providers trying to manipulate the system and confuse HHSC employees. There is some evidence to support this characterization. But when the email is viewed most favorably to Pope and Pickett, it also suggests that there was actual misconduct by some HHSC employees in "allowing" unauthorized trips, and that this misconduct was expressly reported to an appropriate law enforcement authority.

But more than three and a half years passed between this report and Pope's and Pickett's firings. Thus, we agree with HHSC that the report is too remote to support a finding that it caused their terminations. *See Alamo Heights*, 544 S.W.3d at 790 (explaining that an eight-month gap between protected activity and termination has "little, if any, probative value" in proving causation for a retaliation claim).

## C. Pickett's edits to Snyder's letter did not report a violation of law.

Pickett also contends that her email providing comments on Snyder's draft letter qualifies as a report of a legal violation by HHSC or another employee. In her email, Pickett said that some specific

14

statements in the draft were unsupported by documentation or were inaccurate.

These suggested revisions do not report a violation of law for several reasons. Pickett's email never expressed disagreement with the draft letter's recommendation—made in the very same sentence—that the claims at issue "be considered to be allowable." If the federal government agreed with that recommendation, HHSC would no longer be obligated to repay the reimbursement it received for those claims. Nor were Pickett's comments perceived by OIG's federal audit manager, who received them, as "report[ing] a violation of law." When the letter is considered in context, as it must be in a plea to the jurisdiction, *see id.* at 771, there is simply no way in which Pickett's suggested edits can meet the *Pridgen* standard of conveying actionable "information." 653 S.W.3d at 184.

Pickett's email also did not provide information that would "assist in identifying or investigating a violation of law," as we have held that the Act requires. *Id.* at 186 n.7. Instead, Pickett took no issue with the letter's ultimate conclusion that the claims at issue were eligible for federal reimbursement and thus HHSC had no financial liability to the federal government. Pickett's expression of concern regarding some statements another employee suggested to support that conclusion, which appeared in a proposed draft letter that had not yet been sent to the federal government, identified no misconduct by HHSC that amounted to a "violation of law" as defined by the Whistleblower Act. Pickett's edits were not, and in context could not, be viewed as "ferreting out government mismanagement" with an eye toward "protecting the

15

public," which we recently explained are the only types of reports protected under the Whistleblower Act. *See id.* at 184 (citing *Neighborhood Ctrs., Inc. v. Walker*, 544 S.W.3d 744, 748 (Tex. 2018)).

**D.  The record shows no report that OIG violated the law by failing to investigate or enforce the accompaniment requirements.**

Pope additionally contends that she reported OIG's failure to act on the information about the accompaniment problems with LeFleur. In her view, this failure violated OIG's "responsib[ility]" to investigate abuse and enforce the law under section 531.102(a) of the Government Code.

But the record reveals that Pope's report instead concerned the failure to collect experience rebates, which we discuss in Part III. The court of appeals agreed that during Pope's interview with OIG, she "complained of HHSC's failure to collect the experience-rebate payments." 646 S.W.3d at 567.

Moreover, Pope's argument misreads section 531.102(a). That statute outlines OIG's jurisdiction—the matters it is "responsible for"; it does not establish absolute obligations that OIG has no discretion to tailor based on enforcement priorities, resources, or administrative realities. TEX. GOV'T CODE § 531.102(a). Pope and Pickett seem to view OIG's "responsib[ility] for the prevention, detection, audit, inspection, review, and investigation of fraud, waste, and abuse in the provision and delivery of all health and human services in the state" as fully self-executing. *Id.* But the same statute goes on to require HHSC to "set clear objectives, priorities, and performance standards for [OIG] that emphasize" matters such as "coordinating investigative efforts,"

16

"allocating resources to [particular] cases," and "maximizing [certain] opportunities." *Id.* § 531.102(b). Hence, although section 531.102(a) does articulate OIG's mission, it does not transform OIG into an omnipotent "roving commission," *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 551 (1935) (Cardozo, J., concurring), that is statutorily obliged to deploy the full brunt of its enforcement powers whenever the specter of someone committing healthcare fraud somewhere in the state is raised.

### E. Pope and Pickett did not report any violation of law by the Executive Commissioner.

Finally, Pope and Pickett contend that they also reported a failure to act by HHSC executive leadership that violated the law. The court of appeals appears to have agreed, citing a provision of the Texas Human Resources Code charging HHSC's Executive Commissioner with promulgating rules "requir[ing], as a condition for eligibility for reimbursement . . . , that a child younger than 15 years of age be accompanied at the visit or screening by (A) the child's parent or guardian; or (B) another adult . . . authorized by the child's parent or guardian to accompany the child." TEX. HUM. RES. CODE § 32.024(s).

But the Commissioner fulfilled this statutory obligation by promulgating a rule that Pope and Pickett knew about and were seeking to enforce against LeFleur and other providers. *See* 1 TEX. ADMIN. CODE § 380.207(4). Therefore, this statute cannot provide the basis for a report that a "violation of law" took place.

17

Pope and Pickett also argue that HHSC's Executive Commissioner fell short of his legal obligations under section 321.022 of the Government Code. This section provides:

> If the administrative head of a department or entity that is subject to audit by the state auditor has reasonable cause to believe that money received from the state by the department or entity or by a client or contractor of the department or entity may have been lost, misappropriated, or misused, or that other fraudulent or unlawful conduct has occurred in relation to the operation of the department or entity, the administrative head shall report the reason and basis for the belief to the state auditor. The state auditor may investigate the report or may monitor any investigation conducted by the department or entity.

TEX. GOV'T CODE § 321.022(a).

Pope and Pickett do not explain how this statute would apply absent a state audit or an independent statute identifying unlawful conduct by the Commissioner. Moreover, there is no record of Pope or Pickett actually reporting to a law enforcement authority that the Executive Commissioner failed to notify the state auditor about LeFleur defrauding the State when he had an obligation to do so. This argument therefore fails for lack of an express "report" of a violation of law.

For these reasons, the evidence that Pope and Pickett reported violations of the accompaniment requirement does not support a finding that they reported a violation of law by HHSC or other public employees to an appropriate law enforcement authority, or (in the case of the 2014 call center employee report) that any such violation could have led to their 2017 terminations. The trial court therefore erred to the extent it denied HHSC's plea to the jurisdiction based on these reports.

18

## III.  Experience rebates

We next address Pope and Pickett's separate theory that they were terminated for reporting HHSC's failure to enforce experience rebate payments owed by LeFleur.  In their view, HHSC's delay in recovering the rebates was a "violation of law" that they properly reported under the Whistleblower Act.  We disagree.

The record includes evidence that both Pope and Pickett reported to OIG investigators that HHSC had not enforced experience rebates owed by LeFleur.  But as explained below, OIG was the entity responsible for enforcement, and there is no evidence that they reported a violation *by OIG*.  In addition, Pope and Pickett did not report violations of law because when and how to collect the rebates was an enforcement decision properly within the discretion of HHSC leadership.  Indeed, given Pope's and Pickett's training and experience, it would not be reasonable for them to think that the agency was violating the law in the way it handled the experience rebates.  Agency leaders' choice to work with LeFleur so that it could continue to stay in business while paying off the sums owed did not run afoul of any legal obligations identified by Pope and Pickett that are binding on HHSC.  Thus, Pope's and Pickett's communications about this issue with OIG were not "good faith reports [of] a violation of law" under the Act.  TEX. GOV'T CODE § 554.002(a).

### A.  Pope and Pickett did not report a violation of law by OIG, which was responsible for enforcing rebates.

Pope and Pickett identify a variety of statutes and rules that speak to OIG's enforcement powers, arguing that their complaints about

19

HHSC's failure to recover the experience rebates from LeFleur implicated a "violation of law" by HHSC. In particular, they rely on section 531.102(f)(1) of the Government Code, which requires OIG to conduct a preliminary investigation into any complaint or allegation of Medicaid fraud or abuse from any source, *id.* § 531.102(f)(1), as well as section 531.102(a), which provides that OIG is "responsible for the prevention, detection, audit, inspection, review and investigation of fraud, waste, and abuse in the provision and delivery of all health and human services in the state . . . and the enforcement of state law relating to the provision of those services." *Id.* § 531.102(a); *see also* 1 TEX. ADMIN. CODE § 371.11(a).

But Pope and Pickett did not "report a violation of law" involving *OIG's* failure to *investigate* LeFleur's nonpayment of the experience rebates. Rather, the record shows that they reported only the failure of HHSC and its executive management to collect the rebates owed. This is an important distinction because section 531.102(a) and rule 371.11(a) place the responsibility for enforcing rebate requirements in the hands of OIG. *See* TEX. GOV'T CODE § 531.102(a); 1 TEX. ADMIN. CODE § 371.11(a). Thus, there is an institutional mismatch between Pope's and Pickett's reports and the law. Furthermore, the responsibility to pay the experience rebates rested on LeFleur, *see* 1 TEX. ADMIN. CODE § 353.3, which we have previously explained is neither an "employing governmental entity" nor "another public employee" under the Act.

Pope and Pickett also contend that they reported a violation of section 533.014 of the Government Code, which addresses profit sharing by managed care organizations such as LeFleur. *See* TEX. GOV'T CODE

§ 533.014.  This contention has the same flaw discussed in Part II.E. above: it treats HHSC's statutory obligation to "adopt rules regarding" the profit-sharing experience rebates, *id.*, which the agency did, as if it required HHSC to enforce those rules in a particular way.  To the contrary, the text of the rule HHSC adopted does not establish binding legal obligations for OIG, HHSC, or any other state actor whatsoever. Instead, it simply requires that a managed care organization "pay to the state an experience rebate calculated according to" its contract with HHSC.  1 TEX. ADMIN. CODE § 353.3.

### B.    HHSC and OIG have discretion regarding how to enforce experience rebates.

Even if Pope and Pickett had reported a failure to recover the experience rebates by the responsible entity, OIG, they would not have reported a "violation of law" because Texas law is clear that HHSC and OIG have discretion regarding the enforcement of experience rebates. As discussed in Part II.D., section 531.102(a) establishes the scope of OIG's jurisdiction and authority to conduct investigations and enforce laws; it does not establish a binding obligation on OIG to exercise its jurisdiction in a particular manner or in any particular set of circumstances.[4]    *See* TEX. GOV'T CODE § 531.102(a).  As we have observed, "[t]he complexity of regulatory enforcement requires that a state agency retain broad discretion in carrying out its statutory functions." *State v. Malone Serv. Co.*, 829 S.W.2d 763, 767 (Tex. 1992).

---

[4] *See, e.g.*, *Okoli*, 440 S.W.3d at 619 (describing OIG's authority to conduct civil and criminal investigations).

Indeed, the remainder of section 531.102 expressly confers broad discretion on OIG in exercising this authority. For example, section 531.102(a-5) allows OIG to use multiple tools in performing its functions, "including audits, utilization reviews, provider education, and data analysis." TEX. GOV'T CODE § 531.102(a-5). Section 531.102(g)(1) requires that OIG report a provider suspected of falsifying records to the Medicaid fraud control unit, but it also grants OIG discretion in continuing to investigate and impose appropriate sanctions on such a provider. *Id.* § 531.102(g)(1). And section 531.102(b) provides that HHSC

> . . . in consultation with the inspector general, shall set clear objectives, priorities, and performance standards for the office that emphasize . . . (2) allocating resources to cases that have the strongest supportive evidence and the greatest potential for recovery of money; and (3) maximizing opportunities for referral of cases to the office of the attorney general . . . .

*Id.* § 531.102(b). Thus, HHSC's and OIG's use of discretion to allocate administrative and enforcement resources is mandated by statute.

Pope and Pickett have not pointed to, and we have not located, any statute or rule that establishes an obligation by HHSC or OIG to collect the experience rebate in any particular manner. Such a law is an essential part of their claim under the Act: for an employee to report a violation of law, there must be a statute, rule, or ordinance that prohibits the action taken or requires action to be taken. Put another way, the "employee must have a good-faith belief that a law, which in fact exists, was violated." *City of Houston v. Cotton*, 171 S.W.3d 541, 547 n.10 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (citing

*Llanes v. Corpus Christi Indep. Sch. Dist.*, 64 S.W.3d 638, 643 (Tex. App.—Corpus Christi–Edinburg 2001, pet. denied)). A report "express[ing] disagreement with remedial measures taken" or "internal policy recommendation[s] . . . is not a report of a violation of law that the Whistleblower Act was designed to protect." *Lueck*, 290 S.W.3d at 885.[5] Nor does the Act protect a "prediction of possible regulatory noncompliance," *id.*, or a complaint that internal administrative policies were not followed, *see Barth*, 403 S.W.3d at 854; *Harris Cnty. Precinct Four Constable Dep't v. Grabowski*, 922 S.W.2d 954, 956 (Tex. 1996).

For these reasons, even if Pope and Pickett had made any "reports" about OIG's failure to enforce LeFleur's rebate obligation, those reports would not be covered by the Act. Because Pope and Pickett were expressing their disagreement with their superiors' discretionary choices regarding enforcement, they were not reporting violations of law. Like the reports of possible regulatory noncompliance in *Lueck*, Pope's and Pickett's reports about HHSC's failure to collect the experience rebates merely reiterated what the agency already knew: that LeFleur was not in compliance with its monetary obligations to the State. The only questions before HHSC were discretionary ones regarding *whether*, *when*, and *how* to collect the payments from LeFleur, not whether it *could* collect the payments.

---

[5] *See also Coll. of the Mainland v. Meneke*, 420 S.W.3d 865, 870 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Other complaints and grievances, including alleged violations of an agency's internal procedures and policies, will not support a claim." (citing *Mullins v. Dall. Indep. Sch. Dist.*, 357 S.W.3d 182, 188 (Tex. App.—Dallas 2012, pet. denied))).

The absence of any "law" obligating OIG and HHSC to collect the experience rebates using any particular method or timeline also means that Pope's and Pickett's experience rebate reports cannot satisfy the objective prong of the "good faith" standard for evaluating Whistleblower Act claims. *See Hart*, 917 S.W.2d at 784.[6] Given Pope's and Pickett's training and experience, including their years of service at the MTP and in government, as well as Pickett's training as an attorney, it was not reasonable for them to believe that OIG and HHSC had an obligation to enforce the experience rebates in any particular manner or on any specific timeframe, or that HHSC's senior leadership had an obligation to keep the two of them informed about how that collection process was being facilitated. Simply put, no "reasonably prudent employee in similar circumstances would have believed that the facts as reported were a violation of law." *Id.* at 785.

Other employees' failure to tell Pope and Pickett how OIG and HHSC were planning to collect the rebates from LeFleur does not undermine the agency's discretion or in any way change the "good faith report[] [of] a violation of law" analysis. TEX. GOV'T CODE § 554.002(a). Instead, it merely underscores that the issue was handled at a higher level of HHSC's senior leadership and through its legal staff. The record includes evidence that these leaders took over communications with LeFleur because its relationship with Pope and Pickett had deteriorated

---

[6] It is also unclear whether Pope intended her Whistleblower Act claims to reach the failure to collect experience rebates. In her deposition, Pope explicitly disavowed the experience rebates being "a part of the lawsuit," stating that she believed her termination was caused by her and Pickett "report[ing] violations of law with respect to parental accompaniment."

24

to the point that the leaders were concerned about litigation risk. The risk is illustrated by the letter from LeFleur's counsel to HHSC senior leaders detailing conduct by Pope and Pickett that counsel characterized as "highly unprofessional" and requesting that Pope and Pickett cease all contact with LeFleur personnel on matters unrelated to the transition/winding down of LeFleur's contracts with the state—which would necessarily include Pope and Pickett not contacting LeFleur about the experience rebates.

In sum, evidence that Pope and Pickett reported the nonenforcement of LeFleur's experience rebate obligations does not support a finding that they reported a violation of law by OIG. The trial court therefore erred to the extent it denied HHSC's plea to the jurisdiction based on these reports.

## CONCLUSION

The Texas Whistleblower Act protects only express "reports of a violation of law" by an agency employer or another public employee, not reports based on implications that the appropriate law enforcement agency must then decode. Accordingly, Pope's and Pickett's reports of misconduct by LeFleur in failing to comply with the accompaniment requirements cannot support a Whistleblower Act claim against HHSC. In addition, their reports that LeFleur's experience rebate obligations were not being enforced were expressions of disagreement with internal policy decisions on remedial measures, not reports that OIG violated the law. The trial court therefore erred in denying HHSC's plea to the

25

jurisdiction and motion for summary judgment. We reverse the court of appeals' judgment and render judgment dismissing the suit.

                                         _____

                                         J. Brett Busby
                                         Justice

**OPINION DELIVERED:** May 5, 2023